IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| MIRANT MID-ATLANTIC, LLC | * |
| Plaintiff | * |
| v. | *   Case No. 10-CV-1381 PJM |
| MONTGOMERY COUNTY, MARYLAND | * |
| Defendant | * |

**MONTGOMERY COUNTY'S REPLY TO MIRANT'S OPPOSITION
TO THE COUNTY'S MOTION TO DISMISS AND/OR, IN THE ALTERNATIVE,
FOR SUMMARY JUDGMENT**

*Introductory Observation—Mirant's argument turns all taxes into regulatory fees.*

In order to avoid the effect of the Tax Injunction Act (TIA),[1] Mirant argues that Bill 29-10, which imposes an excise tax on the emission of carbon dioxide in the County, is a regulatory fee, not a tax. At its foundation, Mirant's argument, taken as a whole, attempts to parlay the uncontestable fact that all taxes have an impact on behavior into a conclusion that the County's carbon tax is nothing more than a regulatory measure.

Mirant's argument proves too much, because applying the test suggested by Mirant—the County's carbon tax is designed to motivate Mirant to reduce the amount of carbon dioxide it vents into the airshed—would convert every tax into a regulatory fee. For example, because a tax on cigarettes may discourage smoking does not make the cigarette tax a regulation on

---

[1] 28 U.S.C. § 1341.

tobacco.[2] Because a gasoline tax may discourage the use of automobiles, does not convert the gasoline tax into a regulation of automobiles.[3]

The County's carbon tax, like the cigarette tax and the gasoline tax, regulates nothing. Bill 29-10 raises revenue – nothing more. Bill 29-10 does not compel any standard of conduct on those who emit carbon dioxide. The Bill neither mandates that Mirant limit the amount of carbon dioxide it emits nor subjects Mirant to criminal or civil sanctions for violating those limits. Mirant remains free to emit carbon dioxide to the same extent that it did before the enactment of Bill 29-10. In fact, the County has assumed that Mirant will continue its present rate of emissions by anticipating that the carbon tax will generate revenue of $ 11.7 - $17.6 million.[4]

*Specific Rebuttal of Mirant's Arguments.*

Mirant argues that the purpose of Bill 29-10 is not to raise revenue, but instead to regulate Mirant. Mirant advances several reasons for this assertion.

A.  Mirant asserts, "Because the funds generated from the emissions fee will be controlled and directed by the same agency responsible for administering the County's regulatory programs, the emissions fee will be used to further regulatory purposes."[5] This assertion is false on three counts:

    1)  Section 52-100 of Bill 29-10 provides that 50% of the tax revenue will go to the County's general fund. The general fund provides a source of revenue to support the general operations of County government, including salaries for police officers,

---

[2] *See*, MD. CODE ANN., TAX-GEN. §§ 12-101, *et seq.*

[3] *See*, MD. CODE ANN., TAX-GEN. §§ 9-101 *et seq.*

[4] *See,* Exhibit 2, Legislative Packet of May 19, 2010, Fiscal and Economic Impact Statement at circle 15, which is attached to the County's Memorandum in support of its Motion to Dismiss.

[5] Mirant's *Memorandum in Opposition*, p. 7.

firefighters, and social workers. As the Fourth Circuit observed in *Valero Terrestrial Corp. v. Caffrey,* 205 F.3d 130, 134 (4th Cir. 2000), "[I]f the ultimate use of the revenue benefits the general public then the charge will qualify as a 'tax,' while if the benefits are more narrowly circumscribed then the charge will more likely qualify as a 'fee'." Since the carbon tax is a charge that benefits the public generally, it is a tax not a fee.

2)    The remaining 50% of the carbon tax must be allocated, under § 52-100, to fund "county greenhouse gas reduction programs, including mass transit." Certainly mass transit also qualifies as a benefit accruing to the general public. Moreover, the County's greenhouse gas programs are not regulatory in nature. Under Chapter 18A, Environmental Sustainability, of the Montgomery County Code, the County has established a climate protection program that provides for increasing the energy efficiency of its fleet of vehicles and establishes a Home Energy Loan Program (HELP) to provide low interest loans to owners of single family homes to improve the energy efficiency of their homes.[6] These programs do not regulate anyone—these programs neither compel nor prohibit any behavior.

3)    Revenue collected under Bill 29-10 will not, and in fact cannot, be "controlled and directed" by an executive agency. The County Council, not Executive Branch agencies, identifies the amount and purposes for which funds may be expended through the annual appropriation process.[7]

---

[6] *See*, §§ 18A-17 to 18A-23 regarding County vehicles and §§ 18A-24 to 18A-32 regarding the HELP, Montgomery County Code (2004).

[7] *See* Montgomery County Charter Sections 301-304. *Haub v. Montgomery County,* 353 Md. 448 (1999) (Montgomery County's annual budget resolution has the force and effect of a law).

3

B.      Mirant argues that because Bill 29-10 appears to apply to only one taxpayer, the Council enacted Bill 29-10 to change the behavior of Mirant. Hence, Mirant concludes that Bill 29-10 is a regulatory measure.

In § 52-95 of Bill 29-10 the Council has declared that greenhouse gases endanger the public health, and that the reduction of greenhouse gases, therefore, benefits the public. In § 52-95 (b) the Council states that efforts to reduce greenhouse gas emissions "constitute a significant investment by the County." In the following subsection (c), the Council concludes that "it is appropriate that the largest emitters of carbon dioxide in the County contribute to paying for these greenhouse gas reduction programs."

Drawing a connection between potential taxpayers and funding programs that are required to respond to the activities of those taxpayers is a reasonable and permissible connection. This type of connection in tax legislation is common. For example, Maryland imposes a tax on gasoline. The vast majority of the State gasoline tax is deposited in the State's Transportation Trust Fund.[8] As previously noted, of course, the gasoline tax imposes no regulatory obligations on drivers, although it might impact driving behavior by increasing the cost of gasoline. Imposing a carbon tax on emitters of carbon dioxide to fund greenhouse gas reduction programs is no different than imposing a tax on gasoline to fund transportation projects.

In the case of the County's carbon tax, the County acknowledges that the potential pool of taxpayers is small, and that the carbon tax does not, therefore, bear the usual characteristic of a tax under the second prong (what population is subject to the charge?) of the three-prong test set

---

[8] *See* MD. CODE ANN., TAX-GEN. § 2-1104.

out by the Fourth Circuit in *Valero* to determine if a governmental charge is a tax.[9] But as the court observed in *Valero* when "the three-part inquiry yields a result that places the charge somewhere in the middle of" what may be described as a "tax" and a "fee,"[10] the court observed that "the most important factor becomes the purpose behind the statute or regulation, which imposes the charge." *Valero, supra,* 205 at 134, citing *South Carolina v. Block,* 717 F.2d. 874, 887 (4th Cir. 1983). The Fourth Circuit then observed that "[I]f the ultimate use of the revenue benefits the general public then the charge will qualify as a 'tax', while if the benefits are more narrowly circumscribed then the charge will more likely qualify as a 'fee.' " *Id.,* citing *San Juan Cellular,* 967 F.2d. 683, 685 (1st Cir. 1992).

Under this litmus test set out in *Valero*, Bill 29-10 emerges as a tax. The carbon tax is expected to generate up to $17.6 million. Half of that amount goes to the general fund which supports schools, police, fire, and other general government functions. The other half is earmarked to support greenhouse gas reduction programs. In the County this means primarily funding the HELP Program, which loans money to homeowners to improve the energy efficiency of single family homes. Revenue from the carbon tax may also fund efforts to make the County's vehicle fleet more energy efficient. None of these greenhouse gas reduction programs is directly related to regulating Mirant or any other emitter of carbon dioxide. In fact, the programs benefit the public generally by reducing greenhouse gas emissions.[11] Hence, the benefits of the tax are broad and are not "narrowly circumscribed." *Valero, supra,* at 134.

---

[9] Some taxes are imposed on a small group. For example, the first federal income tax enacted in October 1913, after ratification of the 16th Amendment, was imposed on less than 1% of the population. U.S. Treasury Fact Sheets: Taxes—History of the U.S. Tax System, http://www.ustreas.gov/education/fact-sheets/taxes/ustax.shtml.

[10] Bill 29-10 passes the other two prongs of the test: The charge was imposed by a legislative body, not an administrative entity, and the charge was imposed to raise revenue to benefit the general public.

[11] The earmarking of tax revenue for specific purposes is not always assured. The Council may and often does erase the earmark during the budget process when there is a budget crisis. For example, in adopting the FY-11 budget, the

Finally, Mirant argues that the Council intended to enact a law that regulated Mirant because Bill 29-10's lead sponsor, Councilmember Berliner, made statements that indicate that the primary goal of Bill 29-10 was to reduce carbon dioxide emissions. Regardless of the intent of Councilmember Berliner's statements, the short answer to this argument is that Council Berliner does not speak for the County Council. The legislation enacted by the Council speaks for the Council's intent. It is universally recognized that "what motivates one legislator to make a speech about a statute is not what necessarily what motivates scores of others to enact it." *Steiner v. County Commissioners of Caroline County*, 490 F. Supp. 2nd 617 (D. Md. 2007), quoting *City of Renton v. Playtime Theaters, Inc.*, 475 U.S. 41, 48 (1986) (quoting *United States v. O'Brien*, 391 U.S. 367, 383-84 (1968).

Looking at the language of Bill 29-10 and its legislative record, it is clear that the Council intended to enact a revenue raising measure, not a regulatory measure. The Bill is devoid of any regulatory measures.[12] The tax is imposed by the Council and collected by the Department of Finance. The tax is deposited into the General Fund of the County, which inures to the benefit of all the citizens of the County. The revenue is not ear-marked to benefit a narrowly circumscribed purpose such as supporting a business licensing program.

Finally, as § 52-96 (d) makes clear, Bill 29-10 was enacted under § 52-17 of the Montgomery County Code. Section 52-17 is a codification of a state public local law enacted by the General Assembly in 1963.[13] Section 52-17 provides that "[t]he County Council for Montgomery County is hereby empowered to have and exercise, within the limits of the County,

---

County Council erased the dedication of certain recordation tax revenues for school construction projects and certain other programs. *See* Bill 14-10.

[12] *See, Maryland Theatrical Corp. v. Brennan*, 180 Md. 377 (1942) (where a charge is enacted solely for revenue purposes and payment of the charge gives the right to carry on a business without any further controls, it is a tax).

[13] *See* 1963 Maryland Laws, Chapter 808.

6

in addition to any and all taxing powers heretofore granted by the General Assembly, the power to tax to the same extent as the State has or could exercise said power within the limits of the County as part of its general taxing power . . . ." The Council, as a body, had no doubt that it was exercising its taxing authority in adopting Bill 29-10, not its authority to regulate under the general police power.[14]

3. Finally, Mirant relies heavily on two cases: *Retail Industry Leaders Ass'n v. Fielder*, 475 F.3d 180 (4th Cir. 2007) (popularly referred to as the *Wal-Mart* case) and *Hager v. City of West Peoria*, 84 F.3d 865 (7th Cir. 1996). Mirant's reliance on both of these cases is misplaced.

In the *Wal-Mart* case, the Fourth Circuit analyzed the Fair Share Health Care Fund Act in the context of the TIA, which was enacted by the Maryland General Assembly. The court recognized that the TIA is "meant to prevent taxpayers from 'disrupting state government finances.' " *Id.* at 189 (quoting *Hibbs v. Winn*, 542 U.S. 88, 104 (2004)). The court then stated that the applicability of the TIA is dependent "primarily on whether a given measure serves 'revenue raising purposes' rather than 'regulatory or punitive purposes.' " *Id.* (quoting *Valero Terrestrial Corp. v. Caffrey*, 205 F.3d 130, 134 (4th Cir. 2000)). Although the court had little trouble in *Wal-Mart* concluding that the Fair Share Act was not a tax provision, the reasons cited by the court for reaching this conclusion illustrates why Bill 29-10 is, in fact, a tax.

First, the court noted that the evidence showed that it was improbable that the Fair Share Act would raise any revenue, particularly in light of two factors: (1) Wal-Mart stated that it would avoid the assessment imposed by the General Assembly by increasing its health care spending; and (2) perhaps most importantly, the General Assembly's Department of Legislative

---

[14] For the County's general authority to regulate under the general police power, *see*, MD. ANN. CODE art. 25A § 5(S).

7

Services indicated that the Act "*mandated* that employers provide a certain level of benefits, and only if they violated the mandate would the State collect monies." *Id.* (emphasis in original).

The Maryland Department of Legislative Services' description of the State Fair Share Act is markedly different than the Legislative Request Report and the fiscal impact statement prepared by the County's Office of Management and Budget that accompanied Bill 29-10. The Legislative Request Report indicates that the goal of the legislation is "to find a steady source of funds for programs to reduce greenhouse gas omissions."[15] The fiscal impact statement indicates that, "it is estimated that this tax will produce annual revenue of $11.7 – $17.6 million, based on available estimates of $CO2$ emissions from major emitters located in the County."[16] Finally, unlike *Wal-Mart*, Mirant does not assert that it intends to avoid the tax by cutting back production to bring its plant below the 1 million ton annual emissions of carbon dioxide mark, which is the trigger that would impose the tax on Mirant.

In the other case relied on by Mirant, *Hager v. City of West Peoria*, the city enacted a municipal ordinance imposing a charge on heavy trucks that used specified roads. The charge was based on the weight of the vehicles in the form of a permit fee. The Seventh Circuit concluded that the charge was a fee because it determined that the purpose of the ordinance was to regulate the use of traffic on municipal roads. The court found as significant that "the revenue generated from the permit fees could not exceed the amount necessary to pay for the road repair made necessary by the heavy truck traffic when, as the mayor testified, only $20.00 had been collected and all other permit fees had been waived. An assessment levied for public purposes would not be a tax where it was part of a regulatory program." *Hager*, 84 F.3d 865, 871 (7th Cir.

---

[15] *See* Exhibit 2, Legislative Packet, Legislative Request Report, circle 5, which is attached to the County's Memorandum in support of its Motion to Dismiss.

[16] *See* Exhibit 2, Legislative Packet, Fiscal and Economic Impact Statement, circle 15, which is attached to the County's Memorandum in support of its Motion to Dismiss.

1996) (internal quotations omitted). In addition, the court noted that the ordinance in question explicitly stated that one of its purposes was to enhance "public safety and highway maintenance, not revenue collection." *Id.* Finally, the *Hager* court pointed out the Illinois enabling authority cited in the ordinance was regulatory and that there were no statutes cited that governed a municipality's efforts to raise revenues.

In stark contrast to the *Hager* ordinance, Bill 29-10 is not part of a regulatory program. The funds collected under the carbon tax are intended to raise significant amounts of revenue, which benefit the County generally. Finally, as already noted, Bill 29-10 was enacted under the County's taxing authority, not its regulatory authority.

*Conclusion*

Taken as a whole, there can be no doubt that Bill 29-10 imposes a tax. Accordingly, this Court lacks subject matter jurisdiction to consider Mirant's Complaint, and this action should be dismissed under the TIA.

Respectfully submitted,

/s/
Marc P. Hansen
Acting County Attorney
Federal Bar No. 26524


/s/
Patricia P. Via, Chief
Division of Litigation – Self Insurance
Federal Bar No. 04829
(signed by Marc P. Hansen, with the permission of Patricia P. Via)

/s/
Scott R. Foncannon
Associate County Attorney
Federal Bar No. 26587
(signed by Marc P. Hansen, with the permission of Scott R. Foncannon)

Attorneys for Defendant
101 Monroe Street, Third Floor
Rockville, MD 20850
240-777-6700

Filed: 7/6/10